**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| JOHN N. HEARN, | ) | |
| | ) | C.A. No.: N16C-08-124 RRC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOTE SERVICES, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Submitted: July 21, 2017
Decided: October 17, 2017

On Defendant Tote Services, Inc.'s Motion in Limine Seeking a Declaration that Florida Law Applies to This Case.[1] **GRANTED.**

# <u>MEMORANDUM OPINION</u>

Laurence V. Cronin, Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware, Attorney for Plaintiff John N. Hearn.

Peter B. Ladig and Meghan A. Adams, Morris James LLP, Wilmington, Delaware; John R. Fornaciari and Thomas E. Hogan, Baker & Hostetler LLP, Washington, D.C., *pro hac vice*, Attorneys for Defendant Tote Services, Inc.

COOCH, R.J.

---

[1] Pending before this Court is the motion for summary judgment of Defendant Tote Services, Inc. The Court has *sua sponte* converted the motion for summary judgment to a motion in limine because the purpose of the motion is to preclude use of otherwise privileged testimony from a federal administrative hearing, pursuant to Florida law, and the Court is not otherwise satisfied that Defendant is entitled to judgment as a matter of law on the present record. *See infra* Part IV.C.

# I. INTRODUCTION

This is a breach of contract action alleging reputational harm to Plaintiff, John N. Hearn.[2] The contract at issue is a three-party Settlement Agreement ("Agreement") between Plaintiff, Defendant Tote Services, Inc. ("Tote"), and American Maritime Officers Union ("Union"). The Union is not a party to this action. The Agreement "arose out of Florida-employer Tote's termination of Union-member John Hearn from his employment as Master of the Florida-based vessel the El Morro following the arrest of crew members in Florida for smuggling illegal drugs aboard the vessel."[3] Plaintiff alleged in his complaint that Defendant breached the Agreement when it failed to expunge certain records pursuant to that agreement and otherwise provided such materials to a participant at an unrelated federal administrative hearing.

The term of the Agreement at issue in this case provides that "Tote agrees that any records of the circumstances giving rise to Employee's grievance shall be expunged, and that it shall respond to any future inquiries concerning Employee's employment by Tote with his sailing positions, dates of employment, and without reference to this matter."[4] The employment records referencing Plaintiff that were not expunged were referenced at a federal administrative hearing to purportedly "attack [Plaintiff's] credibility."[5]

The threshold issue at this stage is whether, if Florida law applies to this Delaware litigation, Defendant is protected under Florida's absolute litigation privilege, which precludes any lawsuit against Defendant stemming from a court or administrative proceeding, where Defendant had apparently not expunged certain records prior to the federal administrative hearing, the disclosure of which, Plaintiff claims, was harmful to his reputation. Both parties have asked the Court to determine which state law should be applied, and second, whether the absolute litigation privileges of the applicable state protects Defendant in this action.

This Court concludes that Florida law applies in this action because the parties and the Agreement have the strongest relationship with Florida, not with Delaware or any other state. This Court additionally finds that Tote is protected by the absolute litigation privilege as defined by that state. Tote's motion in limine is granted.

---

[2] Compl. ¶¶ 26, 31.

[3] Def.'s Mot. For Summ. J.

[4] *Hearn v. Tote Services, Inc.*, C.A. No. N16C-08-124 ¶ 7 (Del. Super. March 23, 2017) (Stipulation of Procedural History and Facts).

[5] *Id.* ¶ 6.

## II. STIPULATED PROCEDURAL HISTORY AND FACTS

The parties, at the Court's request, filed a "Joint Choice of Law Stipulation" that they agree set forth the procedural history and the facts that are determinative for resolution of Defendant's motion. It is set forth below *in toto*:

### I. The Procedural History of This Action

On August 19, 2016, Mr. Hearn instituted the instant action. On October 31, 2016, TSI filed its Motion to Dismiss the Complaint under and pursuant to Superior Court Rule 12(b)(6), and filed its memorandum in support thereof. On November 18, 2016, Mr. Hearn filed his Opposition to TSI's motion and, as part of that opposition, filed the Affidavit of John N. Hearn. On December 8, 2016, TSI filed its Reply to Mr. Hearn's Opposition and, as part of the Reply, filed the Affidavit of Jeffrey J. Corradino. On January 23, 2017, the Court convened a hearing on TOTE's motion, and TSI's motion was withdrawn without prejudice to TOTE filing a later motion for partial summary judgment. At the January 23, 2017 hearing, the parties agreed to file the instant Joint Choice of Law Stipulation.

### II. The Stipulated Facts on Which the Court Should Decide the Choice of Law Issue

1. Plaintiff John N. Hearn has been a resident of Lewes, Delaware since 1994. Prior to moving to Lewes, he lived in Milton, Delaware beginning in about 1989.

2. Since 1974, Mr. Hearn worked almost continuously for Defendant Tote Services, Inc. ("TSI") and its affiliates and predecessors. At the time he was hired, he was also a resident of Delaware. "TSI" will herein refer to TOTE Services, Inc. and its predecessors.

3. Since 1974, Mr. Hearn worked on ships for TSI and its affiliates and predecessors around the world. TSI always paid him to travel from his home in Delaware to wherever he was assigned to join a ship.

4. Masters, and other officers, were members of the American Maritime Officers Union ("AMO"). TSI had a collective bargaining agreement ("CBA") with the AMO which governed some aspects of the employment relationship between TSI and its Masters, including, Mr. Hearn. Mr. Hearn would not have remained employed by TSI if he did not become a member of AMO.

5. TSI is a Delaware corporation which operates several ocean-going cargo vessels. TSI has no offices or operations in Delaware and does not employ any individuals who perform work for them in Delaware.

6. Two of the vessels operated by TSI were two sister container and roll-on roll-off ships: the El Faro and the El Morro. These vessels were owned by a sister company of TSI, TOTE Maritime Puerto Rico, formerly called Sea Star Lines. Container ships are cargo ships that carry cargo in truck size intermodal containers -- a technique called containerization. The El Morro and El Faro also had the ability to carry some RoRo cargo, roll-on and roll-off cargo.

7. During the time period May 29, 2012 through July 2013, the El Yunque (a third sister ship) and the El Morro transported cargo exclusively on one route, from Jacksonville, Florida to San Juan, Puerto Rico and back to Jacksonville. The El Faro was taken out of service for that period.

8. Since at least 2011, TSI's Crewing Department was located in Jacksonville, Florida and made the assignments of the crews on the El Faro and the El Morro. The Crewing Department had authority to assign personnel to ships, except it could not assign or reassign Mr. Hearn or any other Master from his ship without his consent. Discretion and authority to assign Masters who were not already assigned on vessels or whose vessels were taken out of service was under authority of the VP, Personnel at TSI headquarters in New Jersey, subject to the approval of the President of TSI, who was located in Florida as of July 2014. The Crewing Department, after approval by the VP Personnel, assigned Mr. Hearn to be the Captain (Master) of the El Faro, and then of the El Morro. From July 2007 until April 2012, Mr. Hearn was Master of the El Faro. From May 2012 until July 2013, Mr. Hearn was one of the Masters of the El Morro on its run between Jacksonville and San Juan. During this time period, May 2012 to July 2013, Mr. Hearn regularly joined and left the El Morro in Florida traveling directly from his home in Delaware.

9. Before May 2012, Mr. Hearn was assigned to the El Faro and he joined El Faro up to May 2012 in various locations around the world.

10. On or about July 2014, TSI had moved its headquarters offices from New Jersey to Jacksonville, Florida. TSI's crewing and operations offices were already in Jacksonville, and TSI had its maritime operations in Florida, at Blount Island on the St. Johns River, Jacksonville, by July 2014. At the time of the Settlement Agreement in December 2014, TSI's headquarters, maritime and commercial functions were in Jacksonville, Florida.

11. In 2013, U.S. Customs and Border Protection Agents arrested crew members of the El Morro in Florida for smuggling 43 kilos of illegal drugs on the vessel. The smuggling activities occurred in Florida, Puerto Rico and at sea in international waters. The arrests prompted TSI to send two executives (Mitch Walker and Harry Rogers) from New Jersey to inform Mr. Hearn on July 16, 2013 in a face-to-face meeting, on board the El Morro in Jacksonville, Florida, that he must either resign or he would be terminated for cause. In response, that same day, July 16, 2013 in that same face-to-face meeting, Mr. Hearn submitted a handwritten note of

4

resignation to TSI, while on board the El Morro in Jacksonville. On July 17, 2013, Mr. Hearn submitted a letter to TSI withdrawing his July 16, 2013 letter of resignation. TSI thereafter discharged Mr. Hearn for cause by mailing him a letter from TSI's offices in New Jersey to his residence in Delaware.

12. Mr. Hearn was a member of the American Maritime Officers Union ("AMO") whose national headquarters is in Dania, Florida. TSI and the AMO were parties to a Collective Bargaining Agreement. The AMO filed grievance on behalf of Mr. Hearn challenging the discharge. Mr. Hearn was represented by Attorney David Glanstein, located in New York City. Glanstein also represented the AMO. Mr. Glanstein engaged in settlement discussions with TSI on behalf of Mr. Hearn. In addition, TSI sent a number of communications to attorney Glanstein in New York from its attorney located in New Jersey. Mr. Hearn received information regarding the negotiations in Delaware, where he resided. Mr. Hearn never travelled to Florida in connection with the grievance or the settlement negotiations. Rather, the only negotiations in which he participated in person occurred in Philadelphia on the date the arbitration was scheduled in October 2014. A copy of the executed Settlement Agreement between TSI, the AMO and Mr. Hearn is annexed hereto as Exhibit 1.

13. TSI executed the Settlement Agreement in Florida, and TSI in Florida caused the transfer of the payments required in the Settlement Agreement. Mr. Hearn signed the Settlement Agreement in Delaware on December 10, 2014 before sending it to his attorney in New York. Mr. Glanstein then sent Mr. Hearn a fully executed copy from New York to Delaware. Mr. Hearn received in Delaware his payment under the Settlement Agreement.

14. While Mr. Hearn stipulates that the facts included in Paragraphs 15-22 are true, he disputes that any of those facts are relevant for purposes of choice of law.

15. On or about May 2014, the El Morro was retired from service and scrapped.

16. On October 1, 2015, the El Faro sank on route from Jacksonville to Puerto Rico resulting in the death of all thirty-three crew members on board.

17. The United States Coast Guard convened a Marine Board of Investigation into the cause of the sinking of the El Faro which conducted public hearings in Jacksonville, Florida. The MBI is empowered to assess or recommend penalties and to refer issues to the Department of Justice for criminal prosecution, if the MBI suspects a crime was committed.

18. On May 17, 2016, Mr. Hearn was subpoenaed to appear as a witness at the MBI hearings in Jacksonville. Mr. Hearn offered testimony that reflected poorly on TSI both with respect to the conditions of the El Faro and the El Morro and TSI's policies and procedures regarding safety and ship maintenance and operations. After Mr. Hearn testified in response to questioning from the Coast Guard and the

National Transportation Safety Board, attorneys for the estate of Michael Davidson, the Master of the El Faro who perished, cross-examined Mr. Hearn. Davidson's counsel stated that he had no questions but, after conferring with counsel for TSI, conducted the following examination in an attempt to discredit Mr. Hearn's testimony:

Bennett: Sir, you were terminated, weren't you?

Hearn: No. They tried to terminate me, it went to arbitration.

Bennett: Weren't you given a letter on July 15, 2013 that stated: Dear Captain Hearn, quote, Recently the U.S. Customs and Border Protection arrested El Morro crew members for smuggling 43 kilos of illegal drugs by vessel? Do you recall that letter?

Hearn: Not completely, because you're only reading part of it.

Bennett: Do you want to read it in the full?

Hearn: No.

Bennett: I didn't think so. I have no further questions of this witness.

Davidson's counsel obtained the July 15, 2013 termination letter from TSI in order to attack Mr. Hearn's credibility at the Marine Board Hearing.

21. At or about the time Mr. Hearn was discharged by TSI, TSI discharged one other Master and two Chief Mates. The AMO filed grievances on or behalf of Mr. Hearn and the other three officers. TSI settled the grievances of the other three officers as well as Mr. Hearn's. The AMO was a party to the settlements of all four of the discharged officers. TSI had settlement discussions with the AMO in Florida.

22. Either on or before January 1, 2013, TSI began contributing to the Florida unemployment insurance fund on account of wages it paid Mr. Hearn, including on account of the back wages it paid Mr. Hearn under the Settlement Agreement in 2015. Mr. Hearn did not know that TSI contributed to Florida's unemployment insurance fund in connection with his employment and he never paid state income taxes or filed a tax return for any state other than Delaware during his tenure as a TSI employee.[6]

Although the Court originally had suggested that Defendant procedurally should file a motion for "partial" summary judgment after discovery on the choice of law issue was completed, Defendant filed a motion for summary judgment,

---

[6] *Id.* ¶ 1-22.

contending that the outcome of the choice of law determination, if favorable to Defendant, would warrant summary judgment on all issues for Defendant. However, the Court has converted the motion for summary judgment to a motion in limine because the Court believes that the motion for summary judgment was, in effect, a motion in limine and because the Court is not satisfied, at this early juncture, that Defendant on the present record is entitled to judgment as a matter of law.

## III. THE PARTIES' CONTENTIONS

### A.     *Defendant's Contentions*

First, Defendant claims that "Florida is the state that has the most significant relationship to the settlement agreement."[7] Defendant claims that "[t]he most significant relationship test is set forth in Section 188(a) of the Restatement (Second) of Conflicts of Laws, which identifies the following five choice of law considerations: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."[8] Defendant asserts that all of these considerations weigh in favor of Florida law over Delaware law.

Second, Defendant claims that the Florida absolute litigation privilege then bars Plaintiff's breach of contract claim.[9] Defendant asserts that "Florida common law recognizes an 'absolute litigation privilege' pursuant to which statements made in the course of an having some relation to legal proceedings are absolutely privileged and can give rise to no cause of action."[10] "The privilege broadly applies to administrative and judicial proceedings."[11] Defendant claims that because the "statements at issue in the cross-examination of Mr. Hearn at the Maritime Hearing were related to [the] proceeding…" the absolute litigation privilege applies.[12] Furthermore, while Defendant concedes that Delaware courts have not resolved whether the absolute litigation privilege applies in breach of contract claims, it

---

[7] Def.'s Mot. For Summ. J. at 7.

[8] *Id.* at 7-8.

[9] *Id.* at 14.

[10] *Id.* at 15.

[11] *Id.* (citing *Robertson v. Indus. Ins. Co.*, 75 So. 2d 198, 200 (Fla. 1954)).

[12] *Id.* at 16.

7

asserts that, assuming Delaware law applies, limiting the absolute litigation privilege would defeat the purpose of the privilege.[13]

### B.      Plaintiff's Contentions

Plaintiff argues that Delaware law should apply because a "false conflict" exists.[14] "A false conflict of laws exists where the law of the pertinent jurisdictions is different, but one or more of the jurisdictions has no legitimate interest in having its law applied to the case."[15] Plaintiff arrives at this conclusion by arguing that the absolute litigation privilege does not apply here, under either Florida or Delaware law, because Defendant took no affirmative action to breach the contract.[16] Plaintiff contends that, for the purposes of this motion and according to Defendant's own interrogatory responses, Defendant "took no affirmative action to assist the attorney for the estate of Captain Davidson in obtaining or using the [Tote] documents [at the hearing] that should have been expunged" and thus did not breach the contract in the manner alleged in the complaint.[17]

Plaintiff asserts that if the facts set forth in Defendant's interrogatory response actually occurred, then the allegation that Defendant "[gave] a copy of the July 15 Letter to counsel for Captain Davidson to use to impeach [Plaintiff's] credibility"[18] should be removed from the complaint because the only breach was Defendant's failure to expunge Plaintiff's records.[19] Plaintiff's Answering Brief nowhere requests an opportunity to amend the complaint to allege Defendant's non-expungement of Plaintiff's records as the real—and only—basis of Plaintiff's cause of action, although Plaintiff did make such a potential request at oral argument.

---

[13] *Id.* at 18-19. (The Court need not reach this issue of Delaware law as it concludes that Florida law, and therefore the Florida absolute litigation privilege, applies).

[14] Pl.'s Answ. to Def.'s Mot. For Summ. J., at 7.

[15] 16 Am. Jur. 2d Conflict of Laws § 118.

[16] Pl.'s Answ. to Def.'s Mot. For Summ. J., at 7.

[17] *Id.*

[18] Compl. ¶ 30.

[19] Pl.'s Answ. to Def.'s Mot. For Summ. J., at 7.

> Defendant's interrogatory responses, however, tell a different story. Specifically, those interrogatory responses suggest that the only breach of the Settlement Agreement by Defendant was its failure to expunge records and that it took no affirmative action to assist Davidson's attorney in obtaining or using TSI documents that should have been expunged.

Without a breach of contract claim involving "affirmative action" by Defendant, Plaintiff alleges there is no application of the privilege.[20]

Plaintiff alternatively argues that, should the Court conduct a choice of law analysis, Delaware law should apply because the justified expectations of the parties that "all of the provisions in [the] contract are enforceable" is "of considerable importance."[21] Plaintiff contends that the Restatement factors must not be applied "mechanical[ly]" when they conflict with the justified expectations of the parties.[22] Plaintiff asserts that where the parties' intentions cannot be ascertained, the Court should apply the state law under which the expungement term is enforceable.[23]

Plaintiff also argues that, should the Court conduct a choice of law analysis with "the most significant relationship test" as set forth in Section 188(a) of the Restatement (Second) of Conflicts of Laws, the factors weigh in favor of Delaware law of Florida law.

Plaintiff finally argues that the absolute litigation privilege does not apply under either Delaware or Florida law because there is no "nexus between the speech or conduct and the legal proceeding at issue."[24] Plaintiff relies again on Defendant's interrogatories to argue that there is no connection between the breach of the Agreement—that is, by not expunging Plaintiff's records—and the attorney for Davidson's estate's use of the July 15, 2013 letter at the Maritime hearing.[25] Therefore, Plaintiff argues that because Plaintiff is seeking damages from Defendant, and not Davidson's estate's attorney, there is no nexus between the conduct and the Maritime hearing to warrant application of the privilege here.[26]

---

[20] *Id.*

[21] *Id.* at 15; Restatement (Second) of Conflicts Law § 188(2) cmt. b.

[22] Pl.'s Answ. to Def.'s Mot. For Summ. J., at 18.

[23] *Id.* at 15.

[24] *Id.* at 24.

[25] *Id.*

[26] *Id.*

## IV. DISCUSSION

### A. *Florida Law Applies Because Florida Has "the Most Significant Relationship" to the Parties and the Settlement Agreement.*

#### 1. The Restatement (Second) of Conflicts Factors Favor an Application of Florida Law.

The Restatement (Second) of Conflicts lays out several factors for determining which state law should apply in this action.[27] The Delaware Supreme Court has followed this Restatement to apply the law of the state with "the most significant relationship" to the Agreement.[28] These factors include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.[29] Each factor has been taken into consideration.

#### a) *Place of contracting*

Plaintiff was a member of the Union that filed the grievance against Tote, and that Union was headquartered in Florida.[30] "The place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect."[31] Plaintiff and the Union executed the Agreement on December 10, 2014, and then Tote executed the Agreement on December 12, 2014 in Florida.[32] The last act necessary to make the contract binding occurred in Florida. This factor weighs in favor of applying Florida Law.

#### b) *Place of negotiation of the contract*

Tote and the Union conducted negotiations in Florida.[33] There is nothing to suggest that any negotiations took place in Delaware at all, only that Plaintiff, a

---

[27] Restatement (Second) of Conflicts of Laws Section 188.
[28] *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 2017 WL 1090544, at *5 (Del. Mar. 23, 2017).
[29] Restatement (Second) of Conflicts of Laws Section 188.
[30] Stipulation ¶ 12.
[31] Restatement (Second) of Conflicts of Laws Section 188.
[32] Agreement ¶ 7; Stipulation ¶ 13.
[33] Stipulation ¶ 21.

resident of Lewes, "received information regarding the negotiations."[34] Because the negotiation of the Agreement took place in Florida, this factor weighs in favor of applying Florida law.

### c) *Place of performance of the contract*

"The state where performance is to occur under a contract has an obvious interest in the nature of the performance and in the party who is to perform. . . . It is clear that the local law of the place of performance will be applied to govern all questions relating to details of performance."[35] The performance in this instance refers to Tote's expunging of records as per the Agreement. Because Tote is located in Florida, the place of the performance of the contract is in Florida. This factor weighs in favor of applying Florida law.

### d) *Location of the subject matter of the contract*

The subject matter of the Agreement was the resolution of an employment issue regarding Plaintiff's discharge from Tote's employment. Plaintiff worked for Tote in Florida, and not in Delaware. Further, Plaintiff's release of employment-related claims from the Agreement identified ten specific Florida statutes, to the exclusion of any other state statutes.[36] This factor weighs in favor of applying Florida law.

### e) *Domicil, residence, nationality, place of incorporation and place of business of the parties*

This factor favors Florida law because Florida was much more connected to the parties than Delaware when the Agreement was executed. Tote's headquarters, maritime, and commercial functions were in Florida.[37] In addition, the Union was headquartered in Florida.[38] Plaintiff was terminated by Tote, in Florida.[39] The employment was based in Florida, the Plaintiff worked in Florida, and the alleged injury (the cross-examination) took place in Florida.[40] These are strong indications in the Agreement that the parties intended that Florida law apply, including the

---

[34] *Id.* ¶ 21.
[35] Restatement (Second) of Conflict of Laws Section 188, cmt. e.
[36] Ex. 1 of Stipulation ¶ 2(a).
[37] Stipulation ¶ 10.
[38] *Id.* ¶ 12.
[39] *Id.* ¶¶ 3, 8.
[40] *Id.*

important fact that many potentially applicable Florida statutes were specifically identified. No other potentially applicable other state statues were identified.[41] Because of these connections to Florida, this factor weighs in favor of applying Florida law.

Therefore, in light of the foregoing five factors, Florida has "the most significant relationship" to the Agreement. Florida law applies to this Delaware action.

> 2.     There is No "False Conflict" Between Florida Law and Delaware Law.

Plaintiff's argument that there is a "false conflict" because Defendant "took no affirmative action to assist Davidson's estate's attorney in obtaining or using the [Tote] documents that should have been expunged"[42] is not compelling because he argues that Delaware and Florida law are in conflict, but to avoid the conflict, the Court should disregard his own allegations from his complaint. Plaintiff acknowledges the somewhat unusual procedural posture this case as Plaintiff now argues that Defendant's interrogatory answers, if true, refute Plaintiff's own allegations in the complaint, which, in turn, warrants further discovery and requires denial of Defendant's motion. Essentially, as Defendant puts it, Plaintiff is now arguing "that his claim survives because his allegations might be wrong."[43] Plaintiff seems to contend now that Defendant is not responsible for Davidson's estate's attorney's reference to the July 15, 2013 letter at the hearing, but Plaintiff has not amended his complaint to remove the allegation.

---

[41] *See e.g. White v. Farmers Ins. Exch.*, 1998 WL 34112764, at *8 (N.D. Iowa Feb. 6, 1998) (holding that "numerous references to Colorado law found in [an] insurance policy" created the "justified expectations of the parties" that Colorado law should apply, and "to apply Iowa law rather than Colorado law in this case would fly in the face of the most significant relationship test"); *Crockwell v. Gov't Employees Ins. Co.*, 2001 WL 1268116, at *5 (Conn. Super. Ct. Oct. 9, 2001) (holding that New York law should apply where there were "numerous references to New York law within [an insurance] policy that the contracting parties expected New York law to apply."); *Travelers Ins. Companies v. Rogers*, 579 N.E.2d 1328, 1331 (Ind. Ct. App. 1991) (holding that Michigan Law should apply where "[s]everal portions of [an] insurance contract refer specifically to Michigan law").

[42] *See supra* note 15.

[43] Def.'s Reply in Supp. Of Mot. For Summ. J., at 1.

B.  *Because Florida Law Applies and Because the Documents at Issue Have "Some Relation to" the Marine Board Investigation Hearing, the Florida Absolute Litigation Privilege Applies in This Action.*

Florida common law recognizes a broad application of an absolute litigation privilege when statements made in the course of, and having some relation to, legal proceedings are absolutely privileged and can give rise to no cause of action.[44] The Florida Supreme Court, in *Robertson v. Indus. Ins. Co.,* applied this privilege broadly to administrative and judicial proceedings.[45] The *Robertson* court applied the privilege in the context of Florida State Insurance Commission proceedings and stated that "[t]he majority rule in other jurisdictions supports our conclusion on this point that the rule of privilege invoked in judicial proceedings extends to administrative proceedings involving judicial or quasi-judicial action."[46] The Florida Supreme Court has explained the policy behind the absolute litigation privilege by stating, "[a]lthough the immunity afforded to defamatory statements may indeed bar recovery for bona fide injuries, the chilling effect on free testimony would seriously hamper the adversary system if absolute immunity were not provided."[47] For the privilege to apply, all that is necessary is that the statement or act "has some relation to the proceeding."[48]

Here, because the absolute litigation privilege applies broadly under Florida law, the absolute litigation applies because the documents and Tote have "some relation" to the Maritime hearings. Plaintiff argues that Tote should not be protected by the privilege because Tote was not a party to that specific administrative hearing. However, it is not necessary that Tote be a party, but rather all that is required to be protected by the privilege is that there is "some relation" to the litigation. Here, Tote meets that requirement, and the absolute litigation privilege applies.

---

[44] *James v. Leigh*, 145 So. 3d 1006, 1008 (Fla. Dist. Ct. App. 2014).

[45] 75 So. 2d 198, 200 (Fla. 1954).

[46] *Id.*

[47] *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So. 2d 606, 608 (Fla. 1994).

[48] *Leigh*, 145 So. 3d at 1008; *see also Mosesson v. Jacob D. Fuchsberg Law Firm*, 257 A.D.2d 381, 382, 683 N.Y.S.2d 88, 89 (1999) (holding that the "some relation" test only requires "a minimal possibility of pertinence or the simplest rationality.").

13

*C.*     *The Court Has Converted Defendant's Motion for Summary Judgment to a Motion in Limine Because Defendant Essentially Seeks an Evidentiary Ruling.*

Although filed as a motion for summary judgment, the Court has *sua sponte* determined to treat it as a motion in limine because the issue of the admissibility of the Maritime hearing testimony is essentially evidentiary.[49] A motion in limine is a "device used to establish whether certain evidence may be introduced at trial" and can be used to "prohibit[] the opposing party, counsel or witnesses from offering certain evidence at trial or even mentioning the evidence at trial without first having its admissibility determined outside the presence of the jury."[50]

What Defendant seeks is application of the absolute litigation privilege to preclude use of the testimony gained in the Maritime hearing in order to bar Plaintiff's claim.[51] Plaintiff has conceded that no facts are in dispute regarding the choice of law issue.[52] Plaintiff has requested additional discovery expressly at oral argument[53] and implicitly in his Answering Brief.[54] Plaintiff has apparently acknowledged that he cannot succeed on a failure to expunge claim without the Maritime hearing testimony.[55]

---

[49] Delaware Trial Handbook § 2:10. MOTION IN LIMINE; *see also Rasmussen v. Uniroyal Goodrich Tire Co.*, 1995 WL 945556, at *1 (Del. Super. Ct. Aug. 18, 1995) (resolving a Restatement (Second) of Conflicts choice of law issue on a motion in limine); *see also* § 37:21.Choice of law, 4 Bus. & Com. Litig. Fed. Cts. § 37:21 (4th ed.) (quoting *Vidovic v. Losinjska Plovidba Oour Broadarstvo*, No. CIV. A. 93-3887, 1995 WL 224397, at *2 n.5 (E.D. Pa. Apr. 10, 1995) ("A motion in limine is the appropriate mechanism through which parties can obtain a ruling on choice of law.") (internal brackets omitted).

[50] *Id.*

[51] Def.'s Mot. For Summ. J., at 2-3.

[52] *See* Stipulation.

[53] Transcript of Oral Argument, at 24, 30-31.

[54] Pl.'s Answ. to Def.'s Mot. For Summ. J., at 25.

[55] Transcript of Oral Argument, at 32.

> THE COURT: So, for damages to be applicable in this case, it would necessarily involve facts stemming from the maritime hearing?
> PLAINTIFF'S COUNSEL: I think that's right, your Honor.
> THE COURT: I understand you to say that.
> PLAINTIFF'S COUNSEL: That's correct right.
> THE COURT: There are no separate damages that could be established if it was purely and solely a failure-to-expunge case?
> PLAINTIFF'S COUNSEL: That's correct, your Honor.

14

Plaintiff has never conceded the accuracy of Defendant's interrogatory responses, and in fact, expressed skepticism of same.[56] The Court cannot conclude at this early juncture that Plaintiff will definitely be unable to bring a claim for damages based on failure to expunge without the use of the Maritime hearing testimony and thus cannot say that Defendant is presently entitled to final judgment as a matter of law.

## V. CONCLUSION

Florida law applies in this action because the parties have the most significant relationship with Florida. Because Florida applies an absolute litigation privilege broadly, Tote is protected by that privilege. Therefore, Defendant's Motion for in Limine is **GRANTED**.[57]

_____
Richard R. Cooch, R.J.

cc: Prothonotary

---

[56] Pl.'s Answ. to Def.'s Mot. For Summ. J., at 9. ("Assuming that Defendant is telling the truth in its discovery responses, then Plaintiff's allegations set forth in ¶¶ 25 and 30 are simply wrong.").
[57] The Marine Board has just issued a report on its investigation of the sinking of El Faro. *See* Jason D. Neubauer, *Marine Board's Report*, U.S. Department of Homeland Security, (September 24, 2017), https://media.defense.gov/2017/Oct/01/2001820187/-1/-1/0/FINAL%20PDF%20ROI%2024%20SEP%2017.PDF.